AO 106 (Rev. 01/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Western District of Arkansas

US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

MAY 17 2023

JAMIE GIANI, Clerk
By
Deputy Clerk

| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) Case No. |
| iPhone bearing IMEI:352569482878509, Model: AA2484, seized from Tyler Penix-Andrews | ) 5:23-cm-00020-CDC |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the _____Western_____ District of _____Arkansas_____ *(identify the person or describe property to be searched and give its location):* See "Attachment A"

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized):* See "Attachment B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of __18__ U.S.C. § 641, 1343, 1349, et al and the application is based on these facts: See "Affidavit attachment"

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Loel Skoch, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: May 17, 2023 @ 3:06 pm

City and state: Fayetteville, Arkansas

Hon. Christy D. Comstock, U.S MAGISTRATE JUDGE
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Loel Evers Skoch, being duly sworn, hereby depose and state:

1. This affidavit is in support of an application for a warrant to seize and search the property particularly described in Attachment A – an electronic device – which is currently in law enforcement possession, and to seize and search for certain items particularly described in Attachment B. Attachments A and B are incorporated by reference.

2. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI). I have been a SA with the FBI since 2011. I am currently responsible for conducting criminal investigations of certain criminal statutes contained within Title 18 of the United States Code, including crimes related to fictitious employer schemes, identity theft, fraud through electronic media, bank, wire, and mail fraud, and theft of government funds in general. I am authorized to apply for and execute search warrants and arrest warrants for offenses enumerated in Title 18 of the United States Code. I have participated in and directed investigations involving various types of criminal activity and, because of my training and experience, I am familiar with the tactics, methods, and techniques of committing these various types of fraud-related violations of federal law.

3. The information in this affidavit is based upon my personal knowledge, as well as information learned from other law enforcement agencies, investigators, witnesses, and documents. The facts set forth in this affidavit are based on my personal knowledge and information from others, including other law enforcement officers involved in this case, through interviews and reviews of related state provided unemployment insurance (UI) documents, Small Business Administration's (SBA) Economic Injury Disaster Loan program (EIDL) data, as well as Payroll Protection Program (PPP) documents, electronic files, emails, and other records and files related to this investigation. Since this affidavit is being submitted for the limited purpose of supporting an application for a search warrant, I have not included each fact known to me concerning this investigation, but I have set forth only those facts necessary to establish probable cause.

4. Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 641 (Theft of Government Funds), 18 U.S.C. §§ 1341, 1343, 1344 (Mail, Wire, and Bank Fraud), have occurred and that there is probable cause to search the property particularly described in

Attachment A for evidence, instrumentalities, contraband or fruits of these crimes further described in Attachment B.

## IDENTIFICATION OF THE DEVICE TO BE SEIZED AND EXAMINED

5. The property to be seized and searched is a dark gray-in-color, iPhone, IMEI:352569482878509, Model: AA2484, seized from Tyler Penix-Andrews (**PENIX-ANDREWS**), being held under Rogers' Police Department case number 2022-1845, evidence Tag # 88801. The phone is currently located in evidence, at the Rogers Arkansas Police Department, 1905 South Dixieland Road, Rogers (Benton County), Arkansas 72758, located within the Western District of Arkansas.

6. The applied-for warrant would authorize the examination of the phone for the purpose of identifying electronically stored data particularly described in Attachment B.

## BACKGROUND REGARDING CELLULAR PHONES, THE INTERNET, AND EMAIL

7. The term "computer" as used herein is defined in 18 U.S.C. § 1030(e)(1), and includes an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes a data storage facility or communications facility directly related to or operating in conjunction with such device. The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebooks or laptop computers, cellular or mobile telephones, smart phones, tablets, server computers, network hardware, and electronic storage devices (as that term is defined below).

8. Cellular telephones, including smart phones, offer a broad range of capabilities comparable to computers. In addition to enabling voice communications, cellular telephones have capabilities including, but not limited to: (a) storing names and phone numbers in electronic "address books"; (b) sending, receiving, and storing text messages, emails, and other electronic communications; (c) taking, sending, receiving, and storing still photographs and videos; (d) storing and playing back audio files; (e) storing dates, appointments, and other information on personal calendars; and (f) accessing uploading and downloading information and applications from the Internet. Cellular telephones may also include GPS technology for determining the location of the device. The term "electronic storage devices" includes any physical objects or devices on which computer data can be recorded or saved. Examples include SIM cards, hard drive disks, RAM, floppy disks, flash memory, CD-ROMs, DVDs, ZIP discs, back-up tapes, printer or memory buffers, smart cards, PC cards, and other magnetic or optical media.

9. I have had training in the investigation of computer-related crimes. Based on my training, experience, and knowledge, I know the Internet is a worldwide network of computer systems operated by governmental entities, corporations, individuals, educational institutions, and others. In order to access the Internet, an individual computer user must subscribe to an access provider, which operates a host computer system with direct access to the Internet. The World Wide Web ("www") is a functionality of the Internet, which allows users of the Internet to share information.

10. With a computer/cellular phone connected to the Internet, an individual user can make electronic contact with millions of computers around the world. This connection can be made by any number of means, including modem, local area network, wireless and numerous, cellular and other methods.

11. Email is a popular form of transmitting messages and/or files in an electronic environment between computer users. When an individual computer user sends email, it is initiated at the user's computer, transmitted to the subscriber's email server, and then transmitted to its final destination. A server is a computer that is attached to a dedicated network and serves many users. An email server may allow users to post and read messages and to communicate via electronic means.

12. Based on my training and experience, I know that cellular phones are typically able to save and retain information and records, including, but not limited to, data, documents, photographs, audio recordings, and video recordings.

13. Based on my training and experience, I know that cellular telephones are typically able to access the Internet. Individuals can typically use such electronic devices, among other things, to conduct internet searches, to communicate with other individuals via email, to run computer and software applications, and to visit social media websites. Electronic devices, such as cellular phones often contain contact lists, call and/or communication logs, internet search history, and messages, including text and voice messages.

14. The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term— IP addresses, while other computers, like cellular phones, have dynamic—that is, frequently changed— IP addresses.

15. I know based on my training and experience that electronic devices, including cellular phones, can typically be used to call people, send text messages, and otherwise communicate with other individuals through various applications.

16. Based on my training and experience, I know that cellular phones often retain location information and GPS information. This type of information and records often reveals where the cell phone has traveled and indicates where the possessor of the cell phone has traveled.

17. Forensic evidence on a cellular phone can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. A person with appropriate familiarity with how an electronic device works, such as a cellular phone, may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a cellular phone is evidence may depend on other information stored on a cellular phone and the application of knowledge about how a cellular phone behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the requested warrant.

## BACKGROUND ON THE UNEMPLOYMENT SYSTEM

18. The Social Security Act of 1935 initiated the Unemployment Insurance (UI) system, which is operated and managed by each state at the direction of the federal government, specifically, the United States Department of Labor (DOL). The UI system is designed to provide benefits to persons who are out of work due to no fault of their own, and who meet other eligibility requirements of state laws. On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security (CARES) Act was signed into law. It expanded each state's unemployment office the ability to aid workers impacted by COVID-19, including workers who are not ordinarily eligible for UI benefits. This was done through new temporary UI programs including: Pandemic Unemployment Assistance (PUA) and the Federal Pandemic Unemployment Compensation (FPUC).

19. The Colorado Department of Labor and Employment (CDLE) manages the UI program in Colorado. CDLE provided CARES Act UI benefits from March 11, 2020, through June 26, 2021. To receive benefits, claimants answered specific questions to establish their eligibility. In part, claimants provided their name, social security number, mailing address, as well

as self-certified that they meet one of the COVID-19 related reasons. Beneficiaries were paid from the time they were impacted by the selected COVID-19 related reason in the CDLE online application. On a weekly basis, the claimant then files for weekly payment benefits by certifying that the claimant is unemployed, eligible for benefits and is seeking employment. Once certified, CDLE transferred funds through an interstate wire into the claimant's chosen depository.

20. As a result of my law enforcement experience, I know that UI fraud schemers often communicate via cellular telephones, text messages, emails, internet web-based accounts, and social media. I am aware that identity thieves and/or UI fraud schemers often utilize computers and other electronic storage devices (collectively, "electronic media") to access and create fraudulent accounts and claims, and to communicate with one another to find information to further their fraudulent activities, to include, but not limited to, the use of individuals (also known as money mules) who launder fraudulent proceeds through their bank accounts at financial institutions. The schemers also use these various types of electronic media to make false claims and false statements to government entities, including the United States and state governments.

**BACKGROUND ON THE ECONOMIC INJURY DISASTER LOAN PROGRAM (EIDL)**

21. Another source of relief provided by the CARES Act was the Economic Injury Disaster Loan ("EIDL") program, an SBA program that provides low-interest funding to small businesses, renters, and homeowners affected by declared disasters. The CARES Act authorized SBA to provide EIDLs of up to $2 million to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic. In addition, the CARES Act authorized the SBA to advance up to $10,000 to a small business within three days of its application for an EIDL. The amount of the advance was determined by the number of employees claimed and certified by the small business. Those advances did not have to be repaid.

22. To obtain an EIDL and advance, a qualifying small business must apply to the SBA and provide information about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster. In the case of EIDLs for COVID-19 relief, the 12-month period was the year preceding January 31, 2020. The applicant must also certify that all the information in the application is true and correct to the best of the applicant's knowledge.

23. The amount of an EIDL, if the application is approved, is determined based, in part, on the information provided in the application about employment, revenue, and cost of goods sold, as set forth above. Any funds issued under an EIDL or advance are issued directly by the SBA.

5

EIDL funds can be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments.

## BACKGROUND ON THE PAYROLL PROTECTION PROGRAM (PPP)

24. The CARES Act economic stimulus also included the Paycheck Protection Program (PPP): a series of forgivable loans, guaranteed by the Small Business Administration---an agency of the United States government.

25. To obtain a PPP loan, a qualifying business must submit a PPP loan application, which is signed by an authorized representative of the business. The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) must state, among other things, its: (a) average monthly payroll expense; and (b) number of employees. These figures are used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

26. A PPP loan application must be processed by a participating lender. If a PPP loan application is approved, the participating lender funds the PPP loan using its own monies, which are 100% guaranteed by Small Business Administration (SBA). Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA in the course of processing the loan.

27. PPP loan proceeds must be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period after receiving the proceeds and uses a certain amount of the PPP loan proceeds on payroll expenses.

28. The PPP allows qualifying small-businesses and other organizations to receive loans with a maturity of two years and an interest rate of 1 percent. PPP loan proceeds must be used by businesses on payroll costs, interest on mortgages, rent, and utilities. The PPP allows the interest and principal to be forgiven if businesses spend the proceeds on these expenses within eight weeks of receipt and use at least 75 percent of the forgiven amount for payroll.

## THE UI FRAUD SCHEME

29. There is probable cause to believe that **PENIX-ANDREWS** is involved in a scheme to obtain UI funds by means of a fictitious claim. I received information from the U.S.

Department of Labor Office of the Inspector General (DOL-OIG) that **PENIX-ANDREWS** applied for a PUA unemployment claim in Colorado on or about May 30, 2020, from IP address 107.218.169.26, which appears to be generated from AT&T services out of the Springdale, Arkansas area.

30. DOL-OIG contacted the CDLE - Division of Unemployment Insurance regarding **PENIX-ANDREWS**. **PENIX-ANDREWS** filed the unemployment claim on May 31, 2020, stating that he became unemployed in Colorado the week of March 1, 2020. **PENIX-ANDREWS** claimed that he lived at 1281 Ulster Street, Unit 418, Denver Colorado, 80231. **PENIX-ANDREWS** claimed to be a self-employed lawyer with 12 years of experience earning approximately $188,000.00 a year. **PENIX-ANDREWS** also claimed that his business in Colorado made $454,000 in 2019. When asked why he became unemployed **PENIX-ANDREWS** answered "Shut down my offices not enough business to stay afloat."

31. Based on the claim information entered, CDLE approved the claim and set aside $17,617, which became **PENIX-ANDREWS'** maximum benefit amount. CDLE reported **PENIX-ANDREWS** was scheduled to be paid via debit card, but no actual payments have been made as he did not submit the necessary paperwork to substantiate "self-employment."

32. Records indicate that **PENIX-ANDREWS** lived in Arkansas in 2020 through present, and not in Colorado. Records show that on May 29, 2020, **PENIX-ANDREWS** was issued an Arkansas Driver's license listing his address as 269 Viale Benedetto Street, Springdale, Arkansas 72762, while two days later **PENIX-ANDREWS** applied for PUA benefits through the State of Colorado claiming to reside at 1281 Ulster Street, Unit 418, Denver Colorado, 80231. The Colorado Bar Association databanks does not reflect **PENIX-ANDREWS** as being an attorney. According to CDLE, **PENIX-ANDREWS'** PUA claim did not pass the IDMe system, indicating that the claim could be fraudulent.

### THE SMALL BUSINESS ADMINISTRATION FRAUD SCHEMES

33. There is probable cause to believe that **PENIX-ANDREWS** and others are involved in a fraudulent scheme to obtain EIDL and PPP funds by means of fictitious claims. **PENIX-ANDREWS** was indicted in the Eastern District of Washington (2:22-CR-00057-TOR) for wire fraud, conspiracy to commit wire fraud, and aggravated identity theft.

34. The indictment alleges that Yuriy Pavlovich Anishchenko, **PENIX-ANDREWS** (a/k/a "Keith Andrews", "Tyler Penix", "Trevor Penix", "Tyler Keith Penix", "Keith Sanders"), and others engaged in a scheme to defraud the SBA, collectively obtaining millions of dollars in

COVID-19- relief funding to which they were not entitled by making materially false statements concerning their purported businesses.

35.     Anishchenko, a resident of Spokane, Washington, represented in loan applications that he owned and operated the businesses Sage Hollow Management and Grace Summers Enterprise, both purportedly located in Spokane, Washington, and, with **PENIX-ANDREWS'** assistance fraudulently applied for and obtained CARES Act funding through the EIDL program on behalf of both businesses. **PENIX-ANDREWS** contacted Anishchenko and offered to assist him in obtaining an EIDL loan. **PENIX-ANDREWS** created an email address to make it appear that Anishchenko was submitting the loan, and **PENIX-ANDREWS** entered false numbers of the business's employees and revenue. Anishchenko agreed to pay **PENIX-ANDREWS** ten percent of the loan proceeds.

36.     Anishchenko would introduce new "clients" to **PENIX-ANDREWS** to **PENIX-ANDREWS,** who would file EIDL loans on the clients' behalf, in return for a portion of the loan profits.

37.     Prospective "clients" would enter into written agreements with **PENIX-ANDREWS** through his business Andrews Associates Inc. These written agreements provided that **PENIX-ANDREWS** would assist others in securing EIDL from the SBA in a specified amount, usually $150,000, in exchange for a specified fee, usually 10% or $15,000, to be paid within a specified time of receipt of the funding, by the applicant to a specified bank account controlled by **PENIX-ANDREWS**. These written agreements between **PENIX-ANDREWS** and others were not disclosed to the SBA in the resulting EIDL applications, were not approved by the SBA, and were contingent on loan approval. Consequently, all EIDL applications of **PENIX-ANDREWS** and co-conspirators, subject to these written agreements with **PENIX-ANDREWS** were false and fraudulent and would not have been approved by SBA had such agreements been properly disclosed as required by the EIDL loan authorization and agreement.

38.     On or about June 25, 2020, Anishchenko, with the direct assistance of **PENIX-ANDREWS**, applied for an EIDL by submitting application number 3306638649 to SBA, under the name of his wife's purported business, Grace Summers Enterprise. Anishchenko, identified Grace Summers Enterprise as a business located in Spokane, Washington. Anishchenko and **PENIX-ANDREWS**, falsely stated, in the application, that Grace Summers Enterprise had 24 employees as of January 31, 2020, and that its gross revenues for the 12-month period prior to January 31, 2020 was $595,899. Anishchenko and **PENIX-ANDREWS** did not disclose to SBA the fact of their agreement that Anishchenko would pay **PENIX-ANDREWS** a fee for assisting

8

with the EIDL application and securing the EIDL funding. On or about July 1, 2020, Anishchenko, certified that the information in the application was true and correct to the best of his knowledge, under penalty of perjury and of other criminal penalties for false information. These representations and certifications were materially false and fraudulent. In fact, Grace Summers Enterprise was not an active or functioning business as of January 31, 2020. Grace Summers Enterprise did not have 24 employees, nor the gross revenues claimed in the EIDL application. Moreover, Anishchenko had agreed to pay, and did ultimately pay Defendant **PENIX-ANDREWS**, a fee for services provided in connection with applying for and closing the EIDL, which agreement was not disclosed to SBA. Accordingly, neither Grace Summers Enterprise nor Anishchenko were eligible for any EIDL funding.

39. Law enforcement also determined that **PENIX-ANDREWS** held himself out as the owner of Andrews Associates, Inc., a company purportedly located at times in the State of Colorado and the State of Arkansas, which purportedly provided credit recovery services as well as consulting services for businesses in obtaining CARES Act funding through the EIDL and other programs, including companies purportedly owned and operated by Anishchenko, Sage Hollow Management and Grace Summers Enterprise, as well as other purported businesses purportedly owned and operated by other conspirators, many of whom were referred to **PENIX-ANDREWS** by Anishchenko.

40. **PENIX-ANDREWS** further sought and obtained CARES Act funding through the EIDL program and PPP in the name of his own purported companies, including Andrews Associates, Inc., Andrews Associates, LLC, Texas Oil and Gas Express, Inc., Total Logistic Solutions, and Andrews Corp.

41. On March 28, 2021, **PENIX-ANDREWS** submitted a PPP application (Loan number 7839137104) to Arvest Bank using Andrews Associates INC with an address of 268 Vaile Benedetto Street, Springdale, Arkansas 72762 (within the Western District of Arkansas) in the amount of $234,500.00. **PENIX-ANDREWS** listed 13 employees and listed himself as the CEO of the company. **PENIX-ANDREWS** listed on the application gross receipts for Quarter 1 of 2020 being $405,300.80 and Quarter 1 2019 gross receipts being $541,077. Based on an analysis of bank records **PENIX-ANDREWS** did receive a PPP loan in the amount of $234,500.00 from Arvest bank for a company named Andrews Associates INC in which **PENIX-ANDREWS** listed himself as the CEO.

42. Based on an analysis of bank records conducted by your affiant it is not believed that this is a legitimate business or that the loan was legitimately obtained. Specifically, as part of

the PPP application **PENIX-ANDREWS** submitted purported Federal quarterly and annual Tax returns for 2019 and 2020. In these returns, **PENIX-ANDREWS** claims he had nine employees. However, CDLE reported that **PENIX-ANDREWS** never filed any employer wage records or other business records with Colorado. **PENIX-ANDREWS** also submitted what appears to be a State of Change Form with the Colorado Secretary of State, on August 26, 2020, stating that his principal office moved to Bentonville, Arkansas.

43. **PENIX-ANDREWS** created an Arkansas employer wage account for "Andrews Associates" on or about October 7, 2020. On February 3, 2021, **PENIX-ANDREWS** entered wages for six employees (including **PENIX-ANDREWS**) for the third-quarter of 2020 (July, August, September). No other quarters have been reported for wages associated with Andrews Associates and the account was closed on November 25, 2022, for a lack of reporting within eight quarters (2020 through 2022).

### THE PHONE

44. Law enforcement seized two cellular phones from **PENIX-ANDREWS** during an unrelated arrest. During communications with Rogers' Police Detective Mosley, your affiant was informed that one of the phones is believed to contain communications about fraudulent activities related to PPP and PUA. The phone in question is being held under Rogers' Police Department case number 2022-1845, evidence Tag # 88801. The phone is currently located in evidence, at the Rogers Arkansas Police Department, 1905 South Dixieland Road, Rogers (Benton County), Arkansas 72758, which is located within the Western District of Arkansas.

45. Detective Mosley indicated that there were previous police records of the Rogers Police Department that reflected **PENIX-ANDREWS** called the Rogers Police Department from (479) 401-0000 to report a disturbance involving himself and his husband, Trevor Penix on August 20, 2021.

46. On July 8, 2022, Detective Mosley, with the Rogers, Arkansas Police Department interviewed Trevor Penix. Trevor stated (479) 401-0000 was **PENIX-ANDREWS** personal phone. Trevor also told Detective Mosley that **PENIX-ANDREWS** made a large amount of money by helping people obtain money through fraudulently obtained loans, including SBA and PPP loans. Trevor said **PENIX-ANDREWS** does different types of fraud in whatever area he's living in then will move when he gets "hot." Trevor said **PENIX-ANDREWS** would do "credit repair" and would help get people loans, then take 10% of whatever the proceeds were. Trevor said **PENIX-ANDREWS** would help people get loans for shell corporations by forging numbers and tax returns. Trevor was shown a photo of a "creditIQ.io" credit repair business from "Keith

10

Andrews" Facebook page and stated it was the photo for **PENIX-ANDREWS**'s "business." Trevor pointed out what appeared to be photos of different subjects with names such as "Keith Andrews" and Tyler Penix were actually **PENIX-ANDREWS**. Trevor advised "Tyler Keith Andrews" was **PENIX-ANDREWS**'s name before they got married. During the Rogers Police Department investigation, it was determined by Detective Mosley that **PENIX-ANDREWS** uses variations of his name as aliases ("Keith Andrews", "Tyler Penix", "Trevor Penix", "Tyler Keith Penix", "Keith Sanders.") Law enforcement databases show that **PENIX-ANDREWS** uses multiple aliases.

47. On October 3, 2022, Detective Mosley sought an arrest warrant for **PENIX-ANDREWS** on unrelated charges. At the time, **PENIX-ANDREWS** was in possession of two cell phones that were seized by law enforcement and later searched pursuant to a warrant. During booking procedures, **PENIX-ANDREWS** provided the phone numbers of 479-401-0000 and 972-269-6700 for the two phones.

48. On or about March 1, 2023, Rogers Police Department Detective Mosely contacted your affiant and stated that the phone described herein (the one bearing the number 479-401-0000) appears to contain "client lists for credit repair business," individuals sending him photos of their drivers' licenses and social security cards, as well as conversations about SBA loans. Detective Mosley specifically recalled a conversation between **PENIX-ANDREWS** and someone identified as "Bernard Chambers" in which they were discussing a list of individuals referring to the individuals as a "client list."

49. On March 15, 2023, I met with Detective Mosely, and he displayed items on the forensic image of the phone he had seen while conducting his authorized search. This included items that appear to be applications for SBA PPP Loans, EIDL determination letters, bank statements of others, and SBA loan modification letters.

50. In my training and experience, I know the phones have been stored in such a way its contents are, to the extent material to this investigation, in substantially the same state as it was when the phones came into the possession of the Rogers, Arkansas Police department.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

51. Based on my knowledge, training, and experience, I know that cellular phones typically can store information for long periods of time. This information can sometimes be recovered with forensics tools.

52. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of **PENIX-ANDREWS** cell phones. The examination

11

of such cellular phones may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

53. There is probable cause to believe that information located in the cellular phones may provide evidence of, among other things, who **PENIX-ANDREWS'** contacts are, who each of them commonly speaks with, and how frequently each of them interacted with those people.

54. There is probable cause to believe that information located in the cellular phones may provide evidence of, among other things, location data, including GPS information, regarding **PENIX-ANDREWS'** location at the time of the withdrawals of cash from these debit cards and ultimately bank administered accounts.

55. There is probable cause to believe that information in the cellular phones may indicate what applications and programs are saved and/or utilized on the cellular phone. These applications and programs may have information regarding location services and data consistent with unemployment fraud schemes.

56. The manner in which the data is preserved and analyzed may be critical to the successful prosecution of any case based upon this evidence. Computer Forensic Examiners are trained to handle digital evidence. It would be inappropriate and impractical for federal agents to search the image of the cellular phones, and therefore I request permission for Computer Forensic Examiners to do so in this warrant application.

## CONCLUSION

57. Based upon my training and experience, I believe **PENIX-ANDREWS** is part of a larger criminal organization that has infiltrated the UI claim systems of one or more state UI systems and infiltrated the SBA EIDL and PPP loan programs, using the stolen identities of individuals, which has caused fraudulently obtained benefits to be transferred to various bank accounts. From my training and experience, I know that these organizations will often retain and store receipts of financial transactions and proof of mailing of the stolen funds to co-conspirators. Subjects will also carry those documents on their persons, store those items in their residences and/or vehicles, and store electronic photographs of those items on their mobile phones. Based on the aforementioned facts, I believe there is probable cause to believe that the items recovered from this search will contain fruits, evidence, or instrumentalities of the crimes identified above and evidence of the identities of the unknown subject(s) who are involved in the fraudulent schemes.

58. Based upon the foregoing, probable cause exists to believe evidence of violations of 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 641 (Theft of Government Funds), 18 U.S.C. §§

1341, 1343, 1344 (Mail, Wire, and Bank Fraud), 18 U.S.C. 1349 (Conspiracy Mail and/or Wire Fraud) will be found at the property listed in Attachment A. The search and seizure will be for the items listed in Attachment B.

Respectfully submitted,

Loel Evers Skoch
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to me by phone and other reliable electronic means this 17 day of May 2023.

## Attachment A
## PROPERTY TO BE SEARCHED

This warrant applies to information associated with the following:

    1.    The property to be seized and searched is a dark gray-in-color, iPhone, IMEI:352569482878509, Model: AA2484, seized from Tyler Penix-Andrews (**PENIX-ANDREWS**), being held under Rogers' Police Department case number 2022-1845, evidence Tag # 88801. The phone is currently located in evidence, at the Rogers Arkansas Police Department, 1905 South Dixieland Road, Rogers (Benton County), Arkansas 72758, located within the Western District of Arkansas.




14

## Attachment B

## PARTICULAR ITEMS TO BE SEARCHED FOR AND SEIZED

Evidence, instruments, and fruits concerning violations of 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 641 (Theft of Government Funds), 18 U.S.C. §§ 1341, 1343, 1344 (Mail, Wire, and Bank Fraud), including but not limited to the following, for the period, March 1, 2020, to the present date, whether in digital, electronic, or other form:

1. All documents; records; communications; correspondence; electronic files; diaries; envelopes; labels; notes; e-mails; address, contact, or mailing lists; text messages; instant messages; chats; Internet history; records of Internet activity; Internet Protocol addresses; cookies; timestamps; text message logs, instant message logs, and other logs; user profiles; registry information; configuration files; visual depictions; audio recordings or files; and other data or metadata, including GPS tracking data.

2. All claims for unemployment insurance (UI) benefits, SBA EIDL and PPP loan programs, and any documents related to these government claims or benefits; all documents, records or correspondence that may relate in any way to the preparation or submission of income tax returns or claims/loans; any state issued debit cards, other debit cards, credit cards, stored value cards, Treasury checks, check stock, Refund Anticipation Loan checks; documents, records or correspondence that may relate in any way to the possession or use of any prepaid debit or credit cards, or related to any prepaid debit or credit card provider; documents, records or correspondence from, to, or about, any identity check service or provider, any personal information provider, or any credit check service or provider; documents, records or correspondence regarding the disbursement of monies to co-conspirators or otherwise, of unemployment monies, U.S. Treasury monies, or monies from any other state or federal program; any documents or records reflecting personally identifiable information, including names, social security numbers, dates of birth, driver's license numbers, credit card numbers, IRS Forms W-2, W-4, and 1099, and state and federal employment tax records and bank account information ("PII"), how or where PII was used, or where PII was acquired, and all items or documents that when used alone or in combination with another, can establish an identity.

3. Employment records including but not limited to paystubs, payroll receipts, payroll ledgers and registers, work logs, records of earnings by pay period, paid or unpaid periods of employment, earnings statements, rates of pay, changes in rates of pay and effective dates of such changes, requests for disposition or deposit of paychecks, cancelled paychecks (front and back),

notes and correspondence to and from employer, and records reflecting dates of employment, changes in employment, promotions, demotions and termination of employment.

4. All receipts relating to, or arising out of, the sending or delivery of packages, letters, or other items within the U.S. Mail or other interstate carrier, including but not limited to any receipts from a U.S. Post Office and any tracking numbers for such packages, letters, or other items.

5. All receipts for withdrawals from accounts at financial institutions, reflecting dates and amounts of deposits, withdrawals, interest, debit and credit memos, deposit slips, checks deposited, withdrawal slips, cashier's checks, money orders, wire transfers, and any checks issued for withdrawals. This also includes records of money transfers or other disbursements of funds, as well as financial account information, statements, receipts for financial instruments, or other financial records that could contain evidence related to these money transfers or disbursements of funds.

6. Books, records, lists, receipts, money orders, cash, currency of any kind, checks, cashier's checks, passbooks, canceled checks, income and expense summaries, financial statements, state and federal income tax returns, credit card accounts, brokerage accounts, certificates of deposits, wire transfers and other disbursements of funds, in whatever format.

7. Accounts with any Internet service or online data storage providers, cell phone providers, websites, online groups, or online services; passwords, usernames or other identifiers associated with these accounts; and credit/debit card account and other payment information. This warrant authorizes the identification of such accounts (including identifiers and payment methods as listed), but not a search of their contents.

8. Records evidencing the use of the Internet Protocol logs captured by the device, including records of Internet Protocol addresses used.

9. Contextual information necessary to understand the evidence described in this attachment.

10. This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant to locate evidence, fruits, and instrumentalities described in this warrant that may be concealing evidence of fruit of a crime, contraband, evidence of crimes, including evidence of unemployment fraud, SBA loan fraud, financial crimes, identity theft, and any other crime that may be identified during the search.